## DOOD, INC. *v.* UNIVERSAL REALTY COMPANY

[No. 85, September Term, 1957.]

*Decided January 16, 1958.*

The cause was argued before BRUNE, C. J., and HENDER-SON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Louis Samuels* for the appellant.

*R. Lewis Bainder* for the appellee.

PRESCOTT, J., delivered the opinion of the Court.

This appeal is from a decree voiding a contract of sale and directing the return of a $500.00 deposit to the purchaser of leasehold property, on the ground of mutual mistake as to the zoning classification of the property.

Whether or not it is an exception to, or inconsistent with, the objective theory of contracts, Maryland has long recognized that equity may rescind a contract executed as a result of mutual mistake; and this is so even though the agreement is one within the Statute of Frauds. *Smith v. Bounds Package Corp.*, 206 Md. 74, 79, 110 A. 2d 71. See to like effect, *Rest. of the Law, Contracts,* sec. 509. The chancellor found that the contract in this case was entered into at a time when all of the parties assumed the existence of a material fact, the zoning classification of the property, about which they were mistaken. This, of course, involved questions of fact; so we must examine the evidence, in some detail, to determine whether his findings were correct, and sustain them unless they be clearly erroneous. Maryland Rule 886.

The following facts were undisputed. On or about May 23, 1956, Mr. Keyser, a real estate broker sought to interest the Universal Realty Company, the appellee, through one of its partners, a Mr. Berman, in the purchase of 1620 Madison Avenue, in Baltimore, which had been recently purchased under contract of sale by Mr. Keyser and his associates. The appellee had previously purchased about forty similar properties. At Keyser's suggestion, Berman inspected 1620

Madison Avenue, and observed that it was a three-story building with apartments for two tenants on each floor, all of which were occupied. Keyser informed Berman that the total rents were about $60.00 a week, which was a fact. A few days later and before Berman had made any offer on the property, it was sold to Dood, Inc. (Dood), the appellant. Berman, however, was still interested in the property; and Keyser found out that Dood would consider selling the same. Keyser continued the negotiations with Berman, and closed a sale on May 31, 1956, to the appellee. Berman never had any contact with Dood before the sale, except through Keyser. The contract of sale called for a down payment of $500.00, and a balance of $6500.00 to be paid within thirty days from May 21, 1956, the date of the original contract, subject to a ground rent of $120.00. The contract of May 31, 1956, contained this clause:

> "This Contract contains the final and entire Agreement between the parties hereto, and neither they nor their Agents shall be bound by any terms, conditions or representations not herein written; time being of the essence of this Agreement."

The property was in a B Area District, and had been thus classified since March 30, 1931, when first zoned. This would permit an occupancy of no more than four family units. Suit was originally instituted upon the theory that there had been a misrepresentation as to the zoning classification. The bill of complaint, which had been sworn to by Berman, alleged that the appellant had represented that the property was lawfully zoned to permit six families to occupy the property. This allegation was abandoned at the trial below. Keyser testified, and Berman confirmed, he made no representation as to the zoning classification. He frankly admitted he told Berman six families lived in the property, and the truth of this was shown by the personal inspection of Berman. He also testified he thought "six families could live there." The appellee refused to go through with the settlement unless the appellant would reduce the purchase price by $500.00, which the appellant was unwilling to do. On July 11, 1956,

the appellant wrote the appellee stating that as the time for settlement had expired, the appellant considered the contract as abandoned by the appellee, and it would govern itself accordingly.

We now arrive at the disputed portion of the facts. Keyser and Berman were the principal witnesses. The testimony of the other witnesses was in the main undisputed. Keyser testified that the settlement date was postponed several times by the appellee, giving as an excuse that one of the partners was out of town. It was well after the expiration date named in the contract before he (Keyser) had any idea that the appellee was not going to consummate the transaction. It was at this time that Berman demanded the reduction on the ground that too much profit had been made on the sale. Berman claimed the reduction was requested because the restriction would seriously affect the investment yield.

The chancellor found that Keyser was the agent of Dood in negotiating the sale. The testimony to that effect is not overly convincing. There was no dispute over the fact that Berman was negotiating with Keyser before the sale to Dood. Keyser did not testify that he was acting as Dood's agent, but stated that after Dood purchased the property and he found out that Berman was still interested, he (Keyser) sought out Dood and discovered that Dood would sell. He reported this fact to Berman, and took him a signed contract, which was, in turn, signed by the Universal Realty Company. This contract was on a standard form of the Real Estate Board, and the blank in the paragraph that calls for the seller to pay a commission to some individual, firm or corporation was left blank. However, if we assume, *arguendo,* that Keyser was the agent of Dood and the fact that Keyser thought "six families could live there" was sufficient to establish a mistake on the part of his principal, Dood, we must still examine the evidence that was offered to establish the mistake with reference to the appellee.

As this evidence goes to the very heart of the case, it will be set forth, partly in detail. Berman (the same person who had made affidavit to the bill of complaint) was first called and testified as follows:

Q. "Did you have occasion to call the zoning board, in the presence of Mr. Keyser?" A. "No, I don't recall."

Q. "Well, did you or didn't you?" A. "I don't recall."

Q. "You don't recall but—" A. "I don't think I called them in Mr. Keyser's presence, no."

\* \* \*

(The Court) "Mr. Samuels asked you whether or not you called the zoning board in Mr. Keyser's presence and your answer was no. Did you call the zoning board?"

(The Witness) "I turned it over to Mr. Bainder and he called the zoning board."

(The Court) "When was that?"

(The Witness) "That was in June, early part of June. Mr. Bainder informed me he called the zoning board."

\* \* \*

When Mr. Keyser took the stand this occurred:

Q. "What was said?" A. "Prior to the signing of this contract, Mr. Berman, in my presence, called both the zoning board and the Gas & Electric Company, when he discovered there were not individual meters for each apartment. He talked with them and found out, I think, that there were four private meters, one public meter. I may be one over or one below. But he found they were not complete units and he called the zoning board from his office and I think he talked to the very gentleman that was here, Mr. Stout, on the 'phone because he asked me who should he call and I knew Mr. Stout was on the counter there and told him."

Q. "You were there when he called?" A. "Yes, sir."

\* \* \*

(The Court) "Was anything said at that time

by Mr. Berman to you in regard to the number of units allowed?"

(The Witness) "Yes, sir."

(The Court) "What did he say to you and what did you say to him?"

(The Witness) "Mr. Berman reported back from the 'phone conversation, either at that particular moment or a day or so later, when the final contract was to be signed, and was signed, that the property was only zoned for four families."

(The Court) "That was after he had the telephone conversation in your presence?"

(The Witness) "Yes, sir."

(The Court) "And what else did he say?"

(The Witness) "And he said that Mr. Lerner (one of the partners) had objected to his purchasing the property but that they felt it was a good investment and the property was in good maintained condition and they felt they should buy. Mr. Lerner felt they were over-paying for it at that particular time."

(The Court) "But that he thought it was all right, Mr. Berman?"

(The Witness) "Yes, sir, and also Mr. Greenblatt (another partner)."

(The Court) "Did he say anything at that time about not going through with the contract?"

(The Witness) "No, sir."

(The Court) "Did he demand any reduction of the purchase price at that time?"

(The Witness) "No, sir."

(The Court) "Did he ask you to take the matter up with Dood, Incorporated, about a reduction of the contract?"

* * *

(The Witness) "No, sir."

(The Court) "Did he say anything about cancelling or not going through with it?"

(The Witness) "No, sir."

\* \* \*

(The Court) "At the time of entering into the contract, was anything said about the number of apartment units?"

(The Witness) "At the time of the signing of the contract, no, sir."

(The Court) "Mr. Berman or Mr. Greenblatt did not say anything about the number of units?"

(The Witness) "At the time of the signing of the contract, no, sir."

In rebuttal, Berman then testified:

Q. "Mr. Berman, Mr. Keyser testified that prior to or during the course of negotiations and prior to the signing of the contract, that you, in his presence, called up the Gas & Electric Company and also you called up Mr. Stout, of the zoning board, and you were informed that there were only four families could live there. Did you make that call prior to the signing of the contract?" A. "Prior to the signing of the contract?"

Q. "Yes." A. "No. I don't recall that at all."

Q. "Did you make any calls to the zoning board at all in Mr. Keyser's presence?" A. "No, I did not."

Q. "Did you make any calls to the Gas & Electric Company in Mr. Keyser's presence?" A. "No, not that I recall."

\* \* \*

Q. "Did you ever call the zoning board?" A. "After Mr. Bainder told me about it, yes."

Q. "Tell me why did you call the zoning board after Mr. Bainder told you?" A. "Because he told me that it was only zoned for four families. I know Mr. Stout down there and I just thought maybe there was a mistake in the record. I just wanted to reaffirm it, that's all."

Mr. Greenblatt, one of Berman's two partners, could not

remember whether it was before or after the signing of the contract that he learned of the zoning classification; and Mr. Lerner, the third partner, although a witness, was not interrogated about the time when he learned of the zoning. Upon this testimony, it was held that there had been a mutual mistake, and the contract should be cancelled.

The appellees were the plaintiffs, and upon them rested the burden of proof. The parties had created a memorial of their agreement by executing a written contract to furnish a record of the terms of that agreement. In order to justify its annulment upon the ground of mutual mistake, the *quantum* of evidence necessary to sustain the burden of proof is more than a mere preponderance of the evidence. Many cases hold that such proof must be beyond a reasonable doubt; but Maryland has adopted the milder requirement that the proof must be clear and satisfactory. *Aetna Indem. Co. v. Railway Co.,* 112 Md. 389, 397, 76 A. 251; 5 *Williston, Contracts,* (Rev. Ed.), sec. 1597. See also *Rest. of the Law, Contracts,* sec. 511.

We do not think the appellees met the burden placed upon them of showing a mutual mistake by "clear and satisfactory" proof. They instituted suit upon the theory of misrepresentation, which was abandoned. Keyser testified flatly that Berman called the Zoning Board and Gas and Electric Company *before* the signing of the contract, and learned of the zoning classification. Berman's denial thereof was, at best, equivocal. These were the only two witnesses bearing directly on the point. The chancellor thought that both had "been very candid and honest," but concluded that Keyser was mistaken as to the time of his conversation with Berman, because the rents were paramount and a reduction of one-third of them would cause Berman either to request a reduction in the purchase price or a statement that he would not consummate the transaction. This loses sight of a possible bargain obtained by the appellee, even with the present zoning. Keyser testified that Berman said one of the partners thought the price high if restricted to four families, but the other two considered it a good investment. Just because the number of families was limited to four did not neces-

sarily mean a reduction of one-third in the rent. The larger individual family spaces that could be occupied by four families, in the place of six, ordinarily would call for more rent, per family unit, for the additional space. If considered without the possible additional rent, the rentals from the six families amounted to about $60.00 a week, which if reduced to four families would then amount to $40.00 per week, or $2080.00 a year. The purchase price was $7000.00 with a ground rent of $120.00. The ground rent capitalized at 6% would equal $2000.00, making a total purchase price of $9000.00. Thus, the annual return, even from the rental of only four families, would still be more than 20% of the purchase price. That for this class of property this is a sound investment, is indicated by the fact that the purchasers sought only a $500.00 reduction in the purchase price.

But laying aside this argument entirely, the evidence failed to establish by clear and satisfactory evidence a mutual mistake, which was necessary in order for an equity court to cancel the contract; the decree must, therefore, be reversed.

This controversy, in which the costs on appeal alone amount to over $400.00, seems to center on the right of the appellant to retain the $500.00 deposit, but, as the case is presented to us, we are not called upon to decide that question.

*Decree reversed, appellee*
*to pay the costs.*